1  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF OHIO
2  EASTERN DIVISION

3  UNITED STATES OF AMERICA,          Case No. 1:02CR236
                                      Cleveland, Ohio
4           Plaintiff,                February 6, 2004
                                      9:15 a.m.
5
        vs.
6
7  ELIE F. ABBOUD AND
   MICHEL F. ABBOUD,
8
        Defendants.
9
        (TESTIMONY OF CAROLINE STRADER)
10

11           TRANSCRIPT OF PROCEEDINGS

12  HAD BEFORE THE HONORABLE JOHN M. MANOS,

13     JUDGE OF SAID COURT, AND A JURY,

14     ON FRIDAY, FEBRUARY 6TH, 2004

15

16            - - - - -

17

18

19

20  Court Reporter:        Marian E. Banno

21                         801 West Superior Ave.,

22                         Cleveland, Ohio  44113

23                         (216) 357-7061

24            - - - - -

25

APPEARANCES:

For the Government:        Office of the U.S. Attorney
                          By: Matthew Kall, AUSA
                              Ann Rowland, AUSA
                          801 West Superior Avenue,
                          Cleveland, Ohio    44113

For the Defendants:       On behalf of Defendant
Elie F. Abboud:           By:  Roger Synenberg, Esq.
                               Offices of Roger Synenberg
                               The Leader Building
                               526 Superior Avenue
                               Cleveland, Ohio 44114

Michel F. Abboud:         By:  Richard G. Lillie, Esq.
                               Gretchen Holderman, Esq.
                               Lillie Holderman, Esq.
                               75 Public Square, S. 1111
                               Cleveland, Ohio   44113


                          By:  James Willis, Esq.
                               Willis & Blackwell
                               113 St. Clair Bldg.
                               Cleveland, Ohio 44114


Proceedings recorded by mechanical stenography, transcript

produced by computer-aided transcription.

1    February 6, 2004

2    THE COURT:  Call your next witness.

3    MR. KALL:  Your Honor, the government calls

4    Caroline Strader.

5    CAROLINE STRADER

6    of lawful age, a witness called by the GOVERNMENT,

7    being first duly sworn, was examined

8    and testified as follows:

9    DIRECT EXAMINATION OF CAROLINE STRADER

10   BY MR. KALL:

11   Q.    Could you please state your name and spell your last

12   name?

13   A.    Caroline Strader, S-T-R-A-D-E-R.

14   Q.    Did you formerly go by a different last name?

15   A.    Yes.

16   Q.    What was that?

17   A.    Caroline Brigham.  B-R-I-G-H-A-M.

18   Q.    Have you also been known as Caroline York at some

19   time?

20   A.    Yes.

21   Q.    Ms. Strader, where are you employed?

22   A.    I'm currently not employed.  I'm living out of state

23   and working on a consultant basis for my previous employer,

24   First Place Bank.

25   Q.    Where is the First Place Bank located?

1    A.    First Place Bank is located in Warren, Ohio.

2    Q.    Can I ask you to pull the microphone a little closer

3    so everyone can hear you.

4          Have you ever worked at Star Bank?

5    A.    Yes.

6    Q.    When were you employed at Star Bank?

7    A.    I was employed at Star Bank in 1992.  The Star Bank

8    merged with FirStar and U.S. Bank Corp.  I was employed

9    with that organization until November 2000.

10   Q.    In what area did you work at that bank?

11   A.    The cash management, or treasury management area.

12   Q.    Can you please describe what the treasury management

13   or cash management area does?

14   A.    Yes.   That's the area that designs the cash

15   management system to help clients with cash flow.  We

16   provide and implement services for account reconciliation,

17   investment, business checking accounts, balance reporting,

18   internet services.

19   Q.    And were you employed in that area in approximately

20   '95, '96?

21   A.    Yes.

22   Q.    During that time, did you -- did Star Bank ever have

23   any business relationship with Elie and Michel Abboud?

24   A.    Yes, with Randall Financial Services.

25   Q.    Did you understand that to be their business?

1    A.    Yes.

2    Q.    Are you aware how and when that relationship began?

3    A.    Yes.

4    Q.    Can you describe how and when that began?

5    A.    Okay.  As I recollect, it might have been 1994, '93,

6    time frame, Eric Pawnther, the relationship manager at one

7    of our branches, introduced us to Randall Financial,

8    Elie and Michel Abboud, to provide cash management services

9    for their convenient locations and their money order

10   service.

11   Q.    What specifically were they looking for Star Bank to

12   do?

13   A.    They were looking for Star Bank to provide

14   disbursement services for operating accounts and accounts

15   payable for the convenient stores, and also for the money

16   orders.  They needed a checking account for the money

17   orders to clear the money orders.

18   Q.    Can you describe how the money order process would

19   work?

20   A.    Money order processing would work exactly like any

21   other check; it would go through the clearing system.  What

22   we did, we provided them with a business checking account

23   along with their operating accounts.  I think there were

24   four to five accounts that were their disbursement

25   accounts.  We established a main operating account which

1    would be their funding account, so that way, when the

2    checks would clear, the disbursement accounts would act as

3    a zero balance account and the main account would fund all

4    those subordinate or subsidiary accounts automatically for

5    them so they wouldn't have to deposit money in each

6    individual account.

7    Q.    Could you please describe how a money order would go

8    from the Abboud stores through to Star Bank, how that

9    process would operate?

10   A.    Sure.  At the convenient locations, they would issue

11   money orders to their customers, or clients, and those

12   clients would retain them, use them and deposit them or use

13   them as payment for rent or whatever.  Those items would go

14   then to whoever their customer came to at First Bank

15   depository.  First Bank, a depository, would forward them

16   on to --

17                THE COURT:  Would you slow down a little?  We

18   have a court reporter who must take everything down.

19   You're going a mile a minute.

20                THE WITNESS:  I'm sorry.  That's my

21   personality.  I'm very sorry.

22        The First Bank, a depository, would forward the items

23   on to the Federal Reserve Bank.  Part of the money order

24   account that Randall Financial retained with us had a

25   controlled disbursement feature which ensured that all

1  money order accounts would go right directly to the Federal

2  Reserve Bank.

3      At the Federal Reserve Bank it would then, Federal

4  Reserve would report the information to Star Bank so that

5  way early in the morning, Randall Financial would have that

6  clearing information so they would know how much to fund

7  the main operating account.  So they would not have to fund

8  the account until they knew what the clearing items would

9  be.

10 Q.   How did Star Bank set it up for there to be that time

11 period between when the checks -- the money orders were

12 presented and when they had to make the deposit?  How was

13 that set up?

14 A.   That was set up through a balance reporting system.

15 Once we got the information from the Federal Reserve Bank,

16 we would pass it on to Randall Financial.  There was

17 usually two presentments, one very early in the day and I

18 think the cut-off for the second was at 10:30.  So by 11:00

19 each day, they would know exactly what was clearing, the

20 individual checks and the total dollar amount.

21 Q.   How would they know that?

22                MR. SYNENBERG:  Objection, your Honor.

23                THE COURT:  If she knows, she may answer.

24 Answer the question.

25                THE WITNESS:  Okay.

1    Q.    How was that information reported to the Abbouds?

2    A.    It was reported through a direct dial-up.  We

3    provided them with a balance reporting software that would

4    allow them to dial up direct to our bank.  They could dial

5    up as many times in the morning as they wished to look at

6    that clearing information and the total dollar amounts.

7    Q.    Now you have referred to a zero balance account.

8          Are those the accounts that they would be looking

9    at?

10   A.    Yes.  Yes.  They would also have access to the main

11   operating account to see what the balance was in the actual

12   funding account left over from the previous day.  They

13   maintained a small balance in the account to keep the

14   account open.

15   Q.    Could you please describe how the zero balance

16   account and the main account related with one another?

17   A.    Okay.  What we did, the accounts that were the zero

18   balance accounts, the items would clear those accounts, we

19   would report the information through the dial-up system and

20   then at the end of every night, the main account would

21   automatically fund the subordinate or subsidiary accounts

22   and return that back to zero.  So every day, the zero

23   balance accounts would look to the main operating account

24   to be funded.

25   Q.    What was supposed to be put into the main account?

1   A.   A deposit to cover all the cleared items.

2   Q.   You said this business came to Star in approximately

3   '93, '94, you said?

4   A.   Yes.

5   Q.   Did the Abbouds tell you -- strike that.

6        Where was this business before that, do you know?

7   A.   I recall seeing some analysis statements from

8   National City.  They showed me what they were paying as far

9   as service charges.  They were looking for a bank to give

10  them more discount on service charges.  And also they had

11  mentioned that they had accounts at Ameritrust, as I

12  recall, which became Key Bank, and Key Bank was not

13  interested in continuing to do business with them.

14  Q.   Now when the business came in, can you describe the

15  volume of activity in the account?

16  A.   There were quite a few money orders; most of the

17  volume came through as money orders.  I can't remember the

18  number of items that would clear, but on a monthly basis,

19  service charges were probably anywhere from 15 to 2000 a

20  months.  So there was quite a bit of activity.  Banks

21  typically charge for all the ancillary services, like the

22  dial-up reporting.  We charge purchase item fees; we charge

23  for the zero balance accounting.  We also charge for the

24  control disbursement method.

25  Q.   Were those service charges disclosed to the Abbouds

1    at the time the account was set up?  How would they be

2    determined?

3    A.    Yes.  We prepared a proposal and each month Randall

4    Financial would get and account analysis schedule which

5    would show what was clearing the account.

6    Q.    Did they ever complain about any problems with the

7    way Star was handling the account?

8    A.    Probably the last year, Walter, who handled the

9    reconciliation, I think his name was Walter Rider, I had a

10   lot of communication with Walter, probably on a daily

11   basis, to make sure he had the right clearing information

12   or if he had any problems.  From time to time, the account

13   was overdrawn, just because maybe a deposit was late or the

14   deposit was in-coded wrong.  So we always paid the items,

15   and I worked closely with Walter to make sure the account

16   was in a positive way.

17   Q.    Were there ever any issues regarding services that

18   the Abbouds wanted Star Bank to perform?

19   A.    They discussed that they were having problems with

20   account reconciliation, this would be the statement they

21   would get at the end of the month.  Some of the items that

22   were clearing, the statement did not have a check number on

23   it or a serial number, and in order to provide additional

24   account reconciliation for them, we would have to charge

25   using formal ARP, or account reconciliation processing for

1   them, to automate it for them.  But they didn't opt to use

2   that service because of the cost.

3   Q.   The deposits that were made in to cover the money

4   orders, do you know the source of the funds?

5   A.   Originally I was told, I never saw the deposits going

6   in --

7               MR. LILLIE:  Objection.

8               THE COURT:  Sustained.

9   Q.   Did you have an opportunity to review the bank

10  statements and account information relating to these

11  accounts?

12  A.   I would look at the account analysis statement from

13  time to time to make sure that we were charging the client

14  appropriately.  As far as the deposits, I knew that funds

15  were being put on deposit at our Emory Richmond office in

16  the form of either cash or checks from Parkview at the

17  time, and that was early in the relationship.

18  Q.   Did they tell you why they were checks or deposits

19  coming from Parkview?

20  A.   Yes.

21  Q.   What did they tell you?

22              THE COURT:  Overruled.  Are you objecting?

23              MR. SYNENBERG:  I thought she was going to

24  answer a question that hadn't been asked, Your Honor.

25              THE COURT:  There is no objection?

1    MR. SYNENBERG:  No objection.

2    Q.    What did the Abbouds tell you about those deposits?

3    A.    In the original meeting that we had to bring them on

4    as a client, we wanted to have not just a disbursement

5    account, but we wanted to be able to put on deposit from

6    them their collections from the convenient stores, the true

7    receivables and that would be offsetting the disbursements

8    or money orders that would be clearing so that we would

9    have both sides of the cash management; the collections and

10   the disbursements.

11        They had mentioned to me that they had a very strong

12   relationship with Parkview and he was a major shareholder

13   and they gave him quite a few discounts on service charges.

14   So deposited items that would come through from the

15   deposit, if they brought it to us, we would be charging

16   them for it.

17   Q.    They weren't willing to do that?

18   A.    No.  No.  They didn't want to bring that piece of the

19   relationship over so we were informed they would fund the

20   accounts either through cash or check.

21   Q.    Did something change with Star's relationship with

22   the Abbouds in approximately the summer of 1996?

23   A.    Yes.

24   Q.    What happened?

25   A.    I received a phone call from our operations center

1  that we had recently installed.

2  MR. SYNENBERG:  Objection as to what --

3  THE COURT:  Overruled.  Do you want a side

4  bar, counselor?

5  MR. SYNENBERG:  Yes, Your Honor.

6  (Side-bar conference had off the record.)

7  THE WITNESS:  I received a phone call from

8  our operations center in Cincinnati, Ohio.  They had

9  recently installed a new kiting suspect software system

10  they told me that they --

11  MR. SYNENBERG:  Objection.

12  THE COURT:  Sustained as to what they told

13  you.

14  THE WITNESS:  Pete --

15  MR. SYNENBERG:  Objection.

16  Q.  Let me stop you there and ask a follow-up question.

17  As a result of the phone call that you received, what

18  did you do?

19  A.  We needed to have a meeting with Randall Financial

20  and discuss closing their accounts with Star Bank.

21  Q.  By Randall Financial, who specifically do you mean?

22  A.  Michel and Elie Abboud.

23  Q.  Why did you feel the need to have a discussion with

24  them about closing their accounts?

25  A.  According to the operations officer --

1         MR. SYNENBERG:  Objection, your Honor.

2         THE COURT:  Overruled.

3         THE WITNESS:  They relayed information to me

4    that there was --

5         MR. SYNENBERG:  Objection, your Honor.

6         THE COURT:  Sustained as to what information

7    they relayed to her.

8         THE WITNESS:  They relayed --

9         THE COURT:  Wait a second.

10   Q.   I'll ask a follow-up question.

11        What was your concern that led to the meeting to

12   close the accounts?

13   A.   A risk exposure of up to a million dollars that the

14   Star Bank would be out.

15   Q.   What was the reason for the risk of exposure of up to

16   a million dollars?

17   A.   The kiting of checks through the Randall Financial

18   accounts.

19   Q.   Is that something that had been picked up by the

20   check kiting detection software?

21        MR. SYNENBERG:  Objection, your Honor.

22        THE COURT:  She may answer.

23        THE WITNESS:  Yes.

24   Q.   And did you have a meeting?

25   A.   Yes, we did.

1  Q.   Who was present at that meeting?

2  A.   The first meeting, it was a Harold DeBoe, which was

3  our security officer at the time.  Judy Gunther was the

4  assigned branch manager.  Henry Richmond, myself, Elie

5  Abboud, I'm not sure about Michel, and I think their

6  accountant was there.

7  Q.   What did you tell him at the meeting?

8  A.   Actually, Harold explained to them that we needed to

9  close the accounts.

10             MR. SYNENBERG:  Objection, your Honor?

11             THE COURT:  Overruled.

12 Q.   Did Mr. DeBoe tell them why they needed to close the

13 accounts?

14 A.   The mismanagement of the accounts, that there were

15 large dollar checks clearing the accounts.  The kiting

16 software detects large dollar amounts going in and out of

17 the disbursement account and then being deposited in the

18 main operating account, large dollar, even dollar amounts.

19 And I think the checks were drawn on Huntington bank at the

20 time.  It was very unusual for the money order account

21 because the money order account checks were only $300

22 increments.

23 Q.   Did Star close the accounts immediately?

24 A.   No.

25 Q.   Why not?

1   A.   We knew that there were still some checks issued out

2   there.

3   Q.   By checks, you mean money orders?

4   A.   The money order checks, we would only accept cleared

5   money order checks.  We asked them not to issue any more

6   because we knew that would hurt the business and the

7   reconciliation.  We let those checks clear as long as they

8   promised the funds for those items that were clearing and

9   they agreed, and part of the agreement was that we needed

10   actual available funds wired on a daily basis just to

11   offset those items that were clearing.

12   Q.   You said there was a second meeting that was held?

13   A.   There was a second meeting.  I don't think I was

14   present in that meeting.  Maybe just to tie up some loose

15   ends.

16   Q.   You don't recall the details of that second meeting?

17   A.   No, I don't.

18   Q.   When did the Abbouds' relationship with Star Bank

19   relating to the money orders end?

20   A.   I think we may have closed the last account probably

21   the last quarter of 1996.  Checks were still clearing

22   previously on the checks that were written prior to August,

23   just to make sure those were funded and paid for.

24   Q.   Are you personally aware of any banking activity the

25   Abbouds had at FirStar after that time?

1    A.    No.

2              MR. KALL:  May I have a moment, Your Honor?

3    Q.    Mrs. Strader, at the meeting that you described,

4    approximately when was that meeting you described with you,

5    Mr. DeBoe, the Abbouds; when was that?

6    A.    Actually, probably the second week of August because

7    I was going on vacation; that's when they called me.

8    Q.    August of what year?

9    A.    1996.

10   Q.    At that meeting, did you use a certain term to refer

11   to what the Abbouds were doing?

12   A.    No.

13   Q.    What did you tell them?

14   A.    The term was mismanagement of the account, un --

15   drawing on uncollected funds.

16   Q.    Did you use the word kiting?

17   A.    No.

18   Q.    Why not?

19              MR. LILLIE:  Objection.

20              THE COURT:  She may answer.

21              THE WITNESS:  Typically, what bank

22   representatives do, they really don't mention kiting.

23              MR. SYNENBERG:  Objection, your Honor.

24              THE COURT:  Sustained.

25              THE WITNESS:  If we are the first --

1   Q.   May I ask the previous question, that the objection

2   was overruled on be reread please, Your Honor?

3                (Question read back.)

4                THE COURT:  I didn't hear the second

5   question; what was it?

6                THE COURT:  She may answer.

7                MR. SYNENBERG:  May we approach, Your Honor?

8                (Side bar conference had off the record).

9   Q.   Mrs. Strader, what was the policy of Star Bank when

10   dealing with customers regarding potential kiting?

11   A.   Not to actually use the word kite or kiting suspect.

12   The bank that finds that there is kiting, they are usually

13   the ones that -- we find the loss first.  So the first

14   thing to do is to cover our losses and then ask them to

15   close the account.

16   Q.   Is that why you didn't use the word kiting at that

17   time?

18   A.   Yes.

19                MR. KALL:  No further questions, Your Honor.

20                THE COURT:  You may cross-examine.

21      CROSS-EXAMINATION OF CAROLINE STRADER

22   BY MR. SYNENBERG:

23   Q.   Mrs. Strader, how long have you been in the banking

24   business?

25   A.   25 years.

1  Q.    Have you spoken to an agent or other representative

2  from the government in the last three days?

3  A.    Yes.

4  Q.    Who?

5  A.    I spoke with Dave Morgan.

6  Q.    On how many different occasions?

7  A.    I spoke with Dave Morgan on December 23rd, 2002.

8  Q.    Just in the last three days, I'm talking in the month

9  of February 2004, have you talked with Agent Morgan or

10  anyone else from the government?

11  A.    Dave Morgan, when he gave me my statement for the

12  deposition, and I don't know her name.  She is in the back

13  of the Court, the young lady there.

14  Q.    Special Agent Devereaux?

15  A.    Yes.  She gave me my reimbursement form.

16  Q.    Have you talked with them about, not with respect to

17  your testimony here, but anything with respect to the case?

18  A.    No.

19  Q.    Now, do you recall that you were questioned on

20  December 23rd, 2002?

21  A.    Yes.

22  Q.    Do you recall being interviewed by an agent on

23  December 23rd, 2002?

24  A.    That was Dave Morgan, yes.

25  Q.    And do you recall at that point talking with

1    Mr. Morgan about how much Star Bank was making a year off

2    of the charges from Randall Financial Corporation?

3    A.    Yes.

4    Q.    How much was Star Bank generating in fees for

5    accounts that it was handling for the Abbouds on an annual

6    basis?

7    A.    On an annual basis, it was probably anywhere -- I

8    would say about $36,000 a year.  About a hundred thousand

9    over the relationship because it may have been a three year

10   relationship.

11   Q.    Isn't it a fact, that on December 23rd, 2002, you

12   told Mr. Morgan that while Randall Financial was a customer

13   of Star Bank, the fees generated by the account activity

14   were between 80 and $90,000 per year?

15   A.    I probably mentioned those figures over the whole

16   relationship.  That's not per year.  It was probably

17   $36,000 a year and for the whole relationship Star Bank

18   made probably about 90,000 to $100,000.

19   Q.    So if he noted that in the notes from your interview,

20   he was mistaken?

21   A.    Yes.  Yes.

22   Q.    Now did you deal very much with Elie and Michel

23   Abboud during the course of the relationship?

24   A.    Yes.  Yes.

25   Q.    Was your principal contact one of the Abbouds or was

1   it Walter Ryder?

2   A.    I would talk to Elie from time to time if he needed

3   something, or Walter.  It was two or three times a week

4   that they would request information if there was a problem

5   with a statement, or just questions on the account.

6   Q.    Were you involved with their Star Bank account from

7   the beginning of the relationship to the end of it?

8   A.    Yes.

9   Q.    Was there ever a point in time when you felt they

10  were withholding information from you?

11  A.    No, because I didn't have any questions to ask them.

12  Q.    I have never talked to you or met you before,

13  correct?

14  A.    Yes.

15  Q.    Nor has Mr. Lillie or Mr. Willis, correct?

16  A.    Correct.

17  Q.    Did you at any time feel, prior to the termination of

18  the relationship, that they had been anything but truthful

19  with you in your communications with them?

20  A.    Yes.

21  Q.    I'm sorry, yes?

22  A.    Truthful.  The conversations we had were pretty much

23  the mechanics of the account.  Usually their information

24  they got in the morning, if there was a problem with

25  something through the dial-up, sometimes they would be

1   overdrawn, they would call me right away. It was just the

2   mechanics of the account, day-to-day, statement

3   information.

4   Q.   Did you find that they were always responsive to

5   whatever requests were made from the bank?

6   A.   Yes.

7   Q.   So, for example, if it came up that they were

8   overdrawn because a deposit had been made late or

9   overlooked, did you find that they would respond to that?

10  A.   Yes.

11  Q.   Were they professional in their dealings with you?

12  A.   Yes.

13  Q.   Respectful?

14  A.   Absolutely.

15  Q.   Now you talked a little bit about -- you mentioned

16  several times about service charges.

17       Were service charges charged to the Abbouds something

18  that was of a concern to them in your opinion?

19  A.   Yes.  Just like any other business client, they want

20  to get the most services for the least price.  Very typical

21  business person, yes.

22  Q.   And would you say that someone whose annual service

23  charges were in the area of $35,000 a year was one of your

24  more significant customers?

25  A.   Probably medium size.  Significant revenue is what

1  we're concerned about, uh-huh.

2  Q.  And you said that you would look at the account

3  analysis to make sure that the service charges were enough.

4      Do you recall that testimony?

5  A.  Not enough, but accurate.  You know, making sure

6  everything was recorded, we were charging them

7  appropriately, and then when the account was debited each

8  month for the fees, that the money was there for us.

9  Q.  Was the amount of the fees something that was

10 automatically determined by the computer system with

11 respect to the amount of volume and the service that had

12 been provided?

13 A.  Yes.

14 Q.  What else, if you were to look at the account

15 analysis, could you determine?

16 A.  It would show average balances, average float,

17 average available or collected balance.

18 Q.  When the relationship was terminated with the

19 Abbouds, had Star Bank made sure that all the money that

20 was due them was paid?

21 A.  It probably was.  You know, I don't think we did not

22 stop charging the fees.  I mean it would just continue

23 until the accounts were closed.

24 Q.  To your knowledge, Star Bank didn't lose any money?

25 A.  That's correct.

1   Q.   And are you familiar with suspicious activity

2   reports?

3   A.   Yes.

4   Q.   Have you been involved in the filing of suspicious

5   activity reports during your 25 years in banking?

6   A.   No.

7   Q.   Do you know -- have you had customers who you have

8   been involved with who have had suspicious activity reports

9   filed with, or on?

10   A.   I was involved with Randall Financial.  Mr. DeBoe

11   prepared a SAR, or a suspicious activity report.

12   Q.   Isn't it true that nothing ever came of that?

13   A.   Based on the fact that once the accounts were closed

14   and we did not lose any money, at that point I didn't

15   follow up with our security area.  That is something that I

16   wasn't involved with.

17   Q.   Do you know whether or not anyone from the FBI, or

18   any other regulatory or governmental agencies, came back

19   and inquired about the suspicious activity report?

20   A.   That I do not know.  No one contacted me.

21   Q.   Now, are you familiar with the term carry-over?

22   A.   Carry-over; in one way, yes.

23   Q.   Which way are you familiar with it?

24   A.   Carry-over of excess earnings credit.

25   Q.   Well, let me ask you a question.  If I was to go

1   into -- what time -- did you work at a branch or a

2   particular location?

3   A.   I worked in the corporate offices.

4   Q.   Was there banking performed?  Did they have a branch

5   downstairs?

6   A.   Yes.

7   Q.   If someone came into the bank at Star Bank the last

8   moment of the day and made a deposit, when was it charged

9   against the account?

10                  MR. KALL:  Objection.

11                  THE COURT:  This is outside of the direct

12  examination.  I'll allow this question.  Confine yourself

13  to the direct examination.

14  Q.   Was a charge -- if they were the last customer of the

15  day, at the last open teller at Star Bank, was it charged

16  against their account that day or the next day?

17  A.   As I recall, at Star Bank at that time, they accepted

18  deposits up until the branch closes.  There was no early

19  cut-off or carry-over to the next day.  From what I

20  remember, 4:00 was the cut-off and that was it.

21  Q.   So any deposit that was received by Star Bank was

22  charged against that account that day, is that correct?

23  A.   Yes.  It was posted to the account that day.

24  Q.   Posted to the account that day?

25  A.   Correct, uh-huh.

1. Q.    Is that a decision that's made internally by the

2. bank, or is that a regulatory requirement?

3. A.    Each bank is different based on their processing day.

4. Q.    Now, you talked about Walter having complained about

5. account reconciliation.

6. Was that a complaint that he oftentimes shared with

7. you?

8. A.    Yes.

9. Q.    And was that because of the fact that the information

10. that was provided from Star Bank was inadequate for his

11. purposes of reconciling his books?

12. A.    Yes.

13. Q.    And I think you said that was because the statement

14. didn't provide the serial number of the money order or the

15. check number of the check?

16. A.    Yes.

17. Q.    So all he would get, say picking July 3rd, for

18. example, he would just have a number of numbers

19. representing dollars that would be for various money orders

20. and various checks, but he would not be able to compare

21. that to what had been sold or written?

22. A.    He could, because there's also a tracer number on the

23. statement and on the back of the check.  It would just

24. become more labor intensive for him to reconcile a large

25. volume account like that.

1    MR. SYNENBERG:  Judge, I noticed it's the

2  noon hour, if this is a good time for you.

3    THE COURT:  Do you have many more questions

4  of this witness?

5    MR. SYNENBERG:  I have a few, Your Honor.

6    THE COURT:  We'll take our noon recess.

7  You may proceed to lunch.  You're admonished, as you

8  leave the courtroom and courthouse, that you are not to

9  discuss this case with anyone, not even amongst yourselves.

10  I'm going to reconvene at 1:15.  I want you here in advance

11  of that hour so that we can convene earlier if possible.

12  Understanding that you're not to discuss this case

13  with anyone, not even amongst yourselves, the hour on which

14  we expect to convene and maybe earlier, I want you here in

15  advance of that hour.

16  We now are recessed.

17    (Luncheon recess had.)

18    - - - - -

19

20

21

22

23

24

25

1    AFTERNOON SESSION

2         (Jury in.)

3              THE COURT:  Continue with your

4    cross-examination.

5              MR. SYNENBERG:  Thank you, Your Honor.

6    Q.    Mrs. Strader, your bank served really two functions

7    with respect to the Abbouds; one was the cashing -- I'm

8    sorry, one was an account or accounts for checks, correct

9    and then one was the money orders, is that correct?

10   A.    Checks and money orders are one and the same.

11   Q.    Was -- were there different sections of the bank that

12   would handle them, or was it all handled the same?

13   A.    All handled the same.

14   Q.    At the end of the month when the Abbouds would get

15   their statements, would the checks and money orders they

16   had written all be part of the same statement?

17   A.    Yes.  As long as they had the same account number on

18   it, yes.

19   Q.    I have set in front of you a book, I think it's

20   entitled Defendant's Exhibit JJ.  Could you turn to section

21   JJ of that -- could you turn to the fourth page of that,

22   please?  It should be handwritten notes.

23         Do you see that?

24   A.    Uh-huh.

25   Q.    Are those your handwritten notes, by chance?

1    A.    No.

2    Q.    Do you know who they belong to?

3    A.    I mean I could guess because it looks like --

4    Q.    If you don't know, don't guess, please.

5    A.    It could be one of the people that are missing here

6    that --

7    Q.    If you don't know, that's acceptable.  I just want to

8    know if they are yours.

9          They are not yours, is that correct?

10   A.    That's correct.

11   Q.    Very good.

12         Now with respect to the Abbouds and their account, is

13   it my understanding that on a zero balance account, the

14   person whose account it is does not have to make the

15   deposit to cover the checks until they are informed by the

16   bank that the checks have been presented for payment?

17   A.    As long as the zero account has controlled

18   disbursement services.

19   Q.    And the Abbouds have that, is that correct?

20   A.    That's correct.

21   Q.    If the Abbouds were to write a check on Monday that

22   didn't present itself to the zero bank account until

23   Thursday, they don't have to make the check good until

24   Thursday, is that correct?

25   A.    Correct.

1    Q.    On Thursday, they would be notified that that check
2    had been presented for collection and they would have to
3    make a deposit that date, is that correct?
4    A.    All on the same day.
5    Q.    Isn't it true, when the Abbouds set it up, it was
6    with the understanding that when they were notified the
7    checks had hit the zero balance account and they had to
8    make a deposit, they would be doing it with Parkview
9    Federal checks?
10   A.    Yes.
11   Q.    And that became a problem after awhile, didn't it?
12   A.    It was not a problem until that they -- it wasn't a
13   problem until it was reported to us in Cleveland that they
14   were a kiting suspect.
15   Q.    Even before then, didn't it become a problem with
16   respect to the fact that there were people in the bank
17   whose concern was that Star Bank was funding the Abbouds'
18   business growth interest-free?
19   A.    No.  No one, no.
20   Q.    You don't remember Mr. DeBoe writing after the August
21   9, 1996 meeting, that the bank's concern was that because
22   the Abbouds were paying for the zero balance account with
23   checks, that they were, in effect, getting a longer float
24   and that Star Bank was funding their business
25   interest-free?

1    A.    That would be his description of kiting, yes.

2    Q.    So if he wrote the concern is that we are funding

3    their business growth interest-free, you're saying that

4    would be Mr. DeBoe's description of kiting, correct?

5    A.    Yes.

6    Q.    But, at that point in time, when this business issue

7    or kiting or whatever you want to call it came to

8    attention, then it is that point in time that Star Bank

9    decided to implement a new policy with respect to making

10   deposits in zero balance accounts, isn't it true?

11   A.    I'm not aware of the new policy.

12   Q.    Were you aware that there came a point in time when

13   Star Bank said to the Abbouds, we're not going to allow you

14   to use Parkview Federal checks to satisfy the zero account

15   balance demand, but we want you to have, when you get -- on

16   the date that you're notified that money is due in the zero

17   balance account, we want you to wire funds immediately from

18   Parkview rather than use a check?

19   A.    Correct.

20              MR. KALL:  Objection.

21              THE COURT:  The question is quite lengthy.

22   Q.    I'll break it down, Your Honor.

23         There came a point in time when Star Bank asked the

24   Abbouds to start wire-transferring money directly to the

25   zero balance account, is that correct?

1   A.    That's correct.

2   Q.    That was after the Abbouds, for years, had been using

3   checks to pay off the balances when they were due in the

4   zero balance account, is that correct?

5   A.    That's correct.

6   Q.    And when the Abbouds were paying off the 0 balance

7   accounts with checks, that was in effect giving them

8   another day or two float, correct?

9   A.    Yes.

10   Q.    Because why?

11   A.    I can't answer that.

12   Q.    Okay.  When the Abbouds would pay off, on a Thursday

13   say, for example, if there was a thousand dollars due in a

14   zero balance account and the Abbouds came into Star Bank

15   and would write a check for a thousand dollars, when might

16   Star Bank get actual funds for that?

17   A.    On the Parkview check, maybe one day.

18   Q.    Okay.  That would give the Abbouds an extra day

19   float, correct?

20   A.    It wouldn't give them an extra day float, not at our

21   bank.

22   Q.    Okay.  But it would give them an extra day they had

23   at Parkview to make that check good, correct, because it

24   wouldn't be presented to Parkview until the following day,

25   correct?

1   A.    That's correct.

2   Q.    Nothing illegal about that, is there?

3   A.    No.

4   Q.    And there's nothing illegal, was there, about the

5   Abbouds giving Star Bank Parkview Federal checks to pay off

6   the demands that Star Bank made on the zero balance

7   accounts, correct?

8   A.    Correct.

9   Q.    You talked earlier in your testimony about an SAR.

10       Do you recall that, that you thought had been

11   generated?

12   A.    Yes.  That's what a security department would do in

13   the case of a possible suspect kiting client.

14   Q.    I'm going to direct your attention to the third page

15   of Defendant's Exhibit JJ and ask you to take a look at

16   that and if you could tell us what that is; if you could

17   just identify that?

18   A.    It must be the -- it's a security loss form that was

19   prepared by Harold DeBoe.

20   Q.    Is that the same form as a security, as a SAR, a

21   suspicious activity report?

22   A.    I have never seen a SAR but I know they exist.

23   Q.    Have you seen a security loss form before?

24   A.    No.

25   Q.    So you don't know if this is the SAR or an internal

1    document in the bank, correct?

2    A.    That's correct.

3    Q.    But you do know now, looking at that, how much the

4    potential, reported potential loss was; does that refresh

5    your recollection?

6    A.    What was told to me was a larger dollar amount.

7    Q.    What does this show the dollar amount was?

8    A.    400,000.

9    Q.    Okay.  Now even after you have these meetings with

10   the Abbouds in 1996, isn't it true that Star Bank continued

11   to conduct business with the Abbouds?

12   A.    Only to close the accounts at the business level.

13   The only accounts that I dealt with, that I was aware of

14   were that they had business with us.  Once they were

15   closed, the relationship, the cash management department or

16   the corporate level in Cleveland was over.

17   Q.    Were you aware that the money order relationship with

18   the Abbouds continued after that time?

19   A.    No.

20                  MR. KALL:  Can I object to the form?

21                  THE COURT:  You didn't object timely.

22                  MR. SYNENBERG:  May I have a moment,

23   Your Honor?

24   Q.    Isn't it true, that one of the services that were

25   provided the Abbouds was check-cashing?

1    A.    I was unaware of that.

2    Q.    Were you aware that the Abbouds would come in to Star

3    Bank to cash checks on a regular basis?

4    A.    I was unaware of that.

5          MR. SYNENBERG:  Thank you very much.  I have

6    no further questions.

7          THE COURT:  Mr. Lillie?

8          MR. LILLIE:  No questions, Your Honor.

9          THE COURT:  Anything further?

10          MR. KALL:  Very briefly, please, Your Honor,

11    <u>REDIRECT EXAMINATION OF CAROLINE STRADER</u>

12    BY MR. KALL:

13    Q.    FirStar, just start with following up on the last

14    question Mr. Synenberg asked you regarding the money order

15    business continuing, what was your understanding?

16          Did the Abbouds continue having any money order

17    business with Star after this period at the end of 1996?

18    A.    Not that I know of, at all.

19    Q.    And Star Bank did what, at the end of 1996?

20    A.    I actually was the one that closed the original

21    account that they had opened through my department.

22    Q.    If they had other checking accounts at Star Bank,

23    that wouldn't be something that would come to your

24    attention, would it?

25    A.    Not unless they needed cash management services like

1    balance reporting or additional services other than just a

2    regular business checking account that they could run money

3    order checks through.

4    Q.   Mr. Synenberg asked you some questions about who you

5    might have talked to in the government, and I'm not sure

6    you were clear as to the time frame and who you talked to.

7    I want to make clear that you and I did meet yesterday,

8    correct?

9    A.   Yes.  Briefly.

10    Q.   And we briefly discussed the subject matters I would

11    be asking you about?

12    A.   That's correct.

13    Q.   And you talked about a reimbursement form you

14    received from Special Agent Devereaux.

15        Was that to cover your travel expenses, parking and

16    the like?

17    A.   That's correct.

18    Q.   You were asked some questions regarding your

19    communications with Mr. Ryder and money order

20    reconciliation.

21        Do you recall those questions?

22    A.   Yes.

23    Q.   And Mr. Synenberg asked you questions regarding the

24    information that Mr. Ryder wanted to have provided to him

25    in order to do the reconciliation.

1    Do you recall those questions?

2    A.    Yes.

3    Q.    Could Star Bank have provided that information?

4    A.    They could have.  It was the nature of the check that

5    caused a lot of the reconciliation problems; nature of the

6    check being a money order that someone, one of their

7    customers, could carry around, put in a wallet and it

8    became damaged.  Most of those checks were the micro line.

9    Q.    Is that the encoding line?

10   A.    Yes.  A lot of the time that gets damaged so because

11   all the money orders were channeled through the Federal

12   Reserve -- the Federal Reserve Bank in Cleveland only

13   repairs so much.  They will only repair the account number

14   and the bank routing number and they would slot those

15   checks into a very thin envelope and re-encode that

16   information on the bottom of that envelope and send the

17   checks to Star Bank.

18        At that point, you know, if we're just going to

19   process them, whatever information is on that encoding line

20   and send them with a statement off to the client.

21   Q.    Mr. Ryder was complaining he didn't have the actual

22   item number, correct?

23   A.    The check number, correct.

24   Q.    Could Star have provided that to them?

25   A.    Yes, for a fee.

1   Q.   Did you inform them of that?

2   A.   Yes.

3   Q.   Were they willing to pay the fee?

4   A.   No, they didn't want to pay any additional service

5   charges.

6   Q.   You were asked questions about how the controlled

7   disbursements accounts operated in conjunction with the

8   zero balance accounts.  I would like to follow up on those

9   questions briefly.

10       Problems that arose in the summer of 1996 arose

11  because what types of items were being written out of the

12  zero balance account?

13  A.   When the new software detected a large kiting

14  suspect, they began reviewing the items that were deposited

15  into the main operating account which funded the ZBA

16  disbursement account and began reviewing items that went

17  through the disbursement accounts.

18       Some of the checks were not money orders; they were

19  very large dollar items written out to cash.

20  Q.   Where were those items deposited?

21  A.   As I recall, it was Huntington bank.

22  Q.   So the Abbouds were writing large dollar amount

23  checks out of this money order account to another bank?

24  A.   Correct.

25  Q.   What was supposed to be happening in that account?

A.   They were only supposed to clear money order checks
and those were amounts, the checks were only made up to
$300.

Q.   What were the dollar amounts on these items you were
seeing going to other banks?

A.   As I recall, they were about in $10,000 increments.

Q.   Were they even dollar amounts?

A.   Correct.

Q.   Mr. Synenberg showed you Exhibit JJ and read you the
statement from Mr. DeBoe.  There was a concern that Star
was funding the business of the Abbouds interest-free.  Let
me get the exact wording, just so I get it right.  The
concern is "We're funding their business growth interest
free."

     Was that a concern of people at Star Bank at the time
you closed out their accounts in 1996?

A.   Yes.

          MR. KALL:  I have no further questions, Your
Honor.

          THE COURT:  Recross-examination?

          MR. SYNENBERG:  Briefly, Your Honor, if I
may.

          THE COURT:  Yes, providing you're confined to
the redirect.

     RECROSS-EXAMINATION OF CAROLINE STRADER

1   BY MR. SYNENBERG:

2   Q.    You just talked about that they were only supposed to

3   clear money order checks in the account.

4         Was there a written agreement to that effect?

5   A.    No, it was assumed that they would only be money

6   order checks.

7   Q.    When in 1996 there was discovery because of this new

8   software, did you have the opportunity to go back and see

9   how many years the Abbouds had been writing these large

10  checks?

11  A.    No, I didn't request to see it or follow up with it

12  based on the fact that security was involved.  My direction

13  was to just -- I was given the direction to begin closing

14  the accounts and making sure whatever checks were clearing

15  were funded by good available funds.

16  Q.    Just so I have a clear understanding, there is no

17  written agreement that it was only supposed to be money

18  orders, correct?

19  A.    Correct.

20  Q.    There were large checks all of a sudden called to the

21  attention of Star Bank because of the new computer program

22  that had been put in, correct?

23  A.    Uh-huh.

24              THE COURT:  Ma'am, we don't know what uh-huh

25  means.

1          THE WITNESS:  I'm sorry, yes.

2     Q.    And the large checks were all of a sudden caught

3     because of the new computer program that had been installed

4     in Star Bank, correct?

5     A.    Yes.

6     Q.    You don't have any idea how many years the Abbouds

7     had been writing the large checks for, is that correct?

8     A.    Correct.

9     Q.    It could have been the entire duration of the

10    relationship since 1992 but you don't know?

11    A.    That's correct.

12              MR. SYNENBERG:  Thank you.

13              THE COURT:  You may step down.

14              THE COURT:  Witness excused.

15                    - - - - -

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

<img src="signature" />

Marian E. Banno, Official Court Reporter
U.S. District Court - Room 7-189
801 West Superior Avenue
Cleveland, Ohio 44113
(216)
357-7061