# IN THE UNITED DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NUMBER 1:02 CR: 00236** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE JOHN ADAMS** |
| | ) | |
| **vs.** | ) | **DEFENDANT'S SENTENCING** |
| | ) | **MEMORANDUM** |
| **ELIE ABBOUD, et al.** | ) | |
| | ) | *and* |
| | ) | |
| **Defendants.** | ) | **OBJECTIONS TO THE REVISED** |
| | ) | **PRE-SENTENCE INVESTIGATION** |
| | ) | **SENTENCE INVESTIGATION** |
| | ) | **REPORT** |

The Defendant, Elie Abboud, will come before this honorable court on August 1, 2006 for sentencing. In light of the Supreme Court's recent decision in *United States v. Booker*, 543 U.S. 220 (2005), it will be the Court's duty at the time of sentencing to impose the sentence which is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to fulfill the purposes of sentencing listed under *id*.(a)(2). *Booker*, 543 U.S. at 260-61; *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006). Section 3553(a) identifies the purposes of sentencing:

(a) provide <u>just</u> punishment for the offense;

(b) afford adequate deterrence to criminal conduct;

(c) protect the public from further crimes of the defendant; and

(d) to provide the defendant with needed medical care or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2) (emphasis added).

For the following reasons, a significantly reduced sentence is sufficient, but not greater than necessary, i.e., "minimally sufficient" and those constitutes just punishment.

Despite being remanded for resentencing, the probation officer has not prepared an updated presentence report until Friday, July 28, 2006 @ 4:00 P.M..

Defendant respectfully notes that the analysis contained in the original presentence report is fundamentally flawed, because it did not even remotely apply the rule established in _United States v. Booker_.[1] Rather, the existing PSI merely computes the guideline range and recommends a sentence within that range. The PSI fails to mention, let alone address, any of the critical factors contained in 18 U.S.C. § 3553(a).

The defendant objects to this approach. Although the law applicable to sentencing changed significantly with the Supreme Court's decision in _United States v. Booker_, 543 U.S. 220 (2005), the PSI is structured as though determining the guideline offense range is the primary factor in determining Mr. Abboud's sentence. But Guideline calculation no longer retains this central role. Although the Sentencing Reform Act applies to this case, once the Supreme Court struck from the Act the mandatory language of 18 U.S.C. § 3553(b)(1), what was left was the multi-factor analysis of § 3553(a). As a result of _Booker_, the focus of the PSI should be Congress's mandate that the Court "shall" impose a sentence which is "sufficient, but not greater than necessary" to achieve four

---

[1] This is unsurprising, because the Booker decision had not issued when the probation officer prepared the original PSI.

objectives.[2] See *United States v. Foreman,* 436 F.2d 638, 643-44 (6th Cir. 2006) (discussing post-*Booker* sentencing procedure); *see also United States v. Vonner*, 2006 WL 1770095 (6th Cir. June 29, 2006). This is the governing statutory rule for sentencing and should be emphasized at the beginning of the report, and followed throughout. The original PSI discusses the Guidelines almost exclusively, and never even refers to the rest of the statute. This is not a proper or legal way to implement the Supreme Court's decision.

Originally to begin with a presumption that the sentence should be a guideline sentence unless otherwise justified was to disregard the holding of *Booker* almost entirely and to invite a sentence that would be unconstitutional. Accordingly, defendant respectfully objects to the PSI's focus on the Guidelines rather than on the Act.

Furthermore, no sentence can lawfully be imposed unless a lesser punishment would not be "sufficient," § 3553(a), to accomplish the legitimate purposes of criminal sentencing. In other words, the sentence, which is "minimally sufficient", *must* be selected and imposed. *United States v. Morris*, 448 F.3d 929, 935 (6th Cir. 2006) (Clay, J., concurring).

Defendant also respectfully suggests that this Court should require the government to prove upward adjustments using the standard of proof of beyond a reasonable doubt, or at least by clear and convincing evidence. The Sixth Circuit has stated that the

---

[2] These purposes are identified in *id.* (a)(2) as: (A) just deserts, denunciation and retribution ("to reflect the seriousness of the offense," "to promote respect for the law," and "to provide *just* punishment" (emphasis added)); (B) "adequate deterrence," both general and specific; (C) "protection of the public from further crimes of the defendant" (incapacitation); (D) to provide rehabilitation "in the most effective manner," such as "needed educational or vocational training," "medical care," or "other correctional treatment."

preponderance of the evidence standard is appropriate, because the guidelines are advisory.  However, the Sixth Circuit also has adopted the position that a sentence within the guidelines range is presumptively reasonable. That latter position appears to give greater weight to the guidelines, supporting a conclusion that a higher standard of proof should be used. In absence of clarification on this point, respect for the original concerns in Apprendi should prevail. ). That is arguably an inherently factual inquiry that goes beyond the mere fact of conviction. <u>Shepard v. United States</u>, ___U.S. ___, 2005 may provide guidance limiting the scope of judicial fact-finding in this regard to make a good faith argument that an <u>Apprendi</u> challenge is appropriate in specific circumstances/case.

For the reasons discussed in this memorandum, that sentence should be a significantly reduced sentence of minimal imprisonment.

### 1. Background

Defendant Elie Abboud is 53 years old. PSI at 2.  Mr. Abboud's story is that of a successful immigrant: he immigrated to this country in 1975 and became a naturalized citizen only six years later, in 1981. Set forth in the PSI at 11, which must be verified by the PSI writer. Eventually, Mr. Abboud's entire immediate family immigrated to this country. Mr. Abboud is close with his family: Mr. Abboud owns and operates convenience and liquor stores with his brother Michel (also a defendant in this case) and his father. Mr. Abboud has five children, four of whom either are attending college or graduate school.  His oldest daughter is a licensed attorney in the State of Ohio. PSI at 11.

Mr. Abboud has an unusually tragic background. Mr. Abboud spent his childhood in Lebanon. When he was five years old, his six-year-old aunt and childhood playmate died from what is believed to be pesticide poisoning. When he was nine years old, his 17-year-old aunt collapsed of a heart aneurysm. However, these childhood events were minor compared to what was to follow.

Mr. Abboud lived in Lebanon during a part of the Lebanese civil war, and the period leading up to the war. In the period before the war began, Christian extremists attempted to recruit members of Lebanese Christian community, who were not extremists, including the Abbouds. During this time, when Mr. Abboud was 22 years old, his brother Michel and his father were kidnapped by Christian Phalangists and held or nine hours. They were targeted for "extermination", and released only when one of the masked kidnappers recognized them and asked that they be released.

After civil war began, many neighbors used the cellar of his family home as a place to hide (most homes did not have cellars). During one of these incidents, Mr. Abboud's seven-year-old neighbor was shot in the head in front of him. On another occasion, he was talking with a friend. During the conversation, unknown persons shot his friend in the head, killing him instantly.

After Mr. Abboud moved to the United States, some of his family remained vulnerable in Lebanon. In 1982, his aunt was stabbed to death, and the family home was burned to the ground. Mr. Abboud experienced further violence in the United States. The next year, in the United States, while his friends and former roommates were out together, a fight broke out. His friend was shot and killed, and his former roommate was

shot and paralyzed. While Mr. Abboud was not present for the shooting, it nonetheless affected him. On another occasion, his brother Malek, who worked as a bouncer in a nightclub, was shot three times in the stomach.

It is unusual for one person to experience so much violence in a lifetime. It is even more unusual for a person so exposed to be able to lead a relatively successful life, without committing any violence himself. While Mr. Abboud's background does not excuse his offense conduct, it is nonetheless something this Court should consider, as part of the defendant's history and character.

The circumstances of the offense also support a reduced sentence. Mr. Abboud's offense conduct is unusual for several reasons. First, while he was convicted of engaging in bank fraud through a check-kiting scheme, he fully repaid the banks, which were exposed, to a risk of loss by his offense. Second, the banks have continued to do business with Mr. Abboud who they apparently consider a valued customer. While the banks' opinion does not affect the calculation of intended loss in this case, the fact that the banks continue to do business with Mr. Abboud strongly indicates that they did not consider his conduct to pose a serious risk of loss.[3] Furthermore, Mr. Abboud's relationship with the banks demonstrates that while he may have violated federal law, he did not cause actual harm. To the extent that Mr. Abboud's conduct caused an actual loss, he has remedied that loss by fully repaying the banks.

---

[3] Because the loss in this case was based upon the risk of loss to the bank, the banks' opinion of Mr. Abboud is worth considering.

Additionally, the circumstances of this offense are sufficiently unusual that the advisory guideline calculation, under both the fraud and the money laundering guidelines overstate the seriousness of the offense conduct. *See* U.S.S.G. §§ 2F1.1; 2S1.1.  Notably, the money laundering conduct in this case is inextricably intertwined with the check kiting scheme: money laundering only occurred because Mr. Abboud used some of the money for other purposes.

For the following reasons, this Court should impose a sentence below the advisory guideline range under 18 U.S.C. § 3553(a).

## 2. The "Advisory" Guideline Calculation Which the Court Must "Consider."

The mandate to sentence within the specified guidelines has been abolished by *Booker*, but the Guidelines remain a factor which the Court must "consider" before imposing sentence. 18 U.S.C. § 3553(a)(4). As a practical matter, it may be permissible to determine the Guidelines first, although that is not to say they should receive the most weight. The Sixth Circuit has held that they are but one of the many factors to be considered. *United States v. Foreman*, 436 F.3d at 644.

Defendant disagrees that the controlling advisory guideline range is that provided by §2S1.1, resulting in an adjusted offense level of 30. Former counsel argued, in earlier sentencing submissions, that the appropriate guideline should be determined based on the gravamen of the underlying offense conduct, here, the Bank Fraud. At the time of Mr. Abboud's offense conduct, the Sixth Circuit recognized that when money laundering and the underlying criminal offense conduct were inextricably intertwined, and the money

laundering conduct fell outside the heartland of money laundering, it could be appropriate to apply different guidelines. *United States v. Chilingirian*, 280 F.3d 704 (6th Cir. 2002).

Alternatively, a departure from the advisory money laundering guidelines is appropriate. *United States v. Hemmingson,* 157 F.3d 347, 361-64 (5th Cir. 1998)(approving downward departure from the money laundering guidelines on basis that conduct was atypical). In *Chilingirian*, while the Sixth Circuit ruled that the district court erred in sentencing the defendant under the fraud guidelines, rather than the money laundering guidelines, the court affirmed the notion that a court could apply different guidelines when the offense conduct fell outside the heartland of the guidelines. *Id.* at 714.

Unlike the defendant in *Chilingirian,* Mr. Abboud's conduct falls totally <u>outside</u> the heartland of the money laundering guidelines. Mr. Abboud did not use the money he obtained to further any illegal business. Nor did he expend the monies on expensive purchases designed to conceal the source of the funds. Respectfully, he used the monies to keep his various legitimate stores/businesses going.

Furthermore, even the fraud guidelines overstate the seriousness of Mr. Abboud's offense conduct. The overstatement of the seriousness of his conduct supports a downward departure or variance from the advisory guidelines. Once there was the slightest concern related by the Bank's, the shortage was repaid in short order. The repayment came from the more than sufficient collateral held by the Banks; loans obtained by the Banks and from cash the Abboud's used immediately for repayment. This Court also should consider that Mr. Abboud began paying back the banks long before the

charges in this case were filed. *See United States v. Lieberman,* 971 F.2d 989, 996 (3d Cir. 1992) (repayment of more restitution than defendant thought was owed showed extraordinary acceptance of responsibility). He began repayment as early as September 1999. He completed repaying the banks mostly in 2000 and 2001 and finally in full before the end of 2002. While fraud loss is calculated as of the date of detection, the fact that Mr. Abboud began the repaying the banks long before charges were brought shows that he did not intend to inflict a loss on the banks. This fact supports a departure or variance from the advisory fraud guidelines under Application Note 11, §2F1.1 (1998-99 ed.).

This Court also should consider reducing Mr. Abboud's adjusted offense level by two levels for acceptance of responsibility. While Mr. Abboud went to trial, he fully repaid the banks involved in this case. His voluntary payment of restitution constitutes extraordinary acceptance of responsibility and supports either an adjustment for acceptance of responsibility or a downward departure or variance from the advisory guidelines. *United States v. Kim*, 364 F.3d 1235, 1240-43 (11th Cir. 2004) (upholding departure for payment of full restitution after adjudication of guilt, emphasis added);' *Lieberman*, 971 F.2d at 996.

### 3. Applicable Departures from the Advisory Guidelines

Calculation of the advisory guidelines also requires consideration of available departures from those guidelines. U.S.S.G. §5K2.13 provides in pertinent part:

> A sentence below the applicable guideline range may be warranted of the defendant committed the offense while suffering from a significantly reduced mental capacity. However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerated defendant to protect the public. If a departure is warranted, the extent of the departure should reflect the extent to which the reduced metal capacity contributed to the commission of the offense.

Mr. Abboud does not fall into any of the three prohibited categories set forth in U.S.S.G. § 5K2.13 and thus is otherwise eligible for this departure.

Application note 1 of the commentary to U.S.S.G. § 5K2.13 defines "significantly reduced mental capacity" as:

> the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or(B) control behavior that the defendant knows is wrongful.

Diminished capacity is considered *an "encouraged" factor* for a downward departure. *United States v. Steele*, 178 F.3d 1230, 1240 (11th Cir. 1999) (the Commission expressly encourages district courts to consider whether the defendant suffered from "significantly reduced mental capacity" at the time of the offense when deciding whether to grant a downward departure). The sentencing court should undertake its inquiry into Mr. Abboud's mental condition and the circumstances of the offense "with a view to lenity, as § 5K2.13 implicitly recommends." *United States v. Chatman*, 986 F.2d 1446, 1454 (D.C. Cir. 1993).

Dr. Deborah Koricke, Ph.D., a clinical psychologist, interviewed and tested Elie Abboud. She administered the MMPI-II, the WAIS, and the IVA-CPT (designed to

screen for Attention Deficit-Hyperactivity Disorder).  After conducting her clinical evaluation, she diagnosed him with a serious mental disorder of long-standing, namely bipolar disorder.

Bipolar disorder is commonly known as manic-depressive disease. While some persons with Bipolar Disorder become psychotic, not all do. Mr. Abboud is one of the latter: his bipolar disease has not caused psychosis. He nonetheless suffered from significantly diminished mental capacity at the time of the offense: his Bipolar Disorder affected both his ability to understand the wrongfulness of his conduct and to control his behavior.

Bipolar disorder is characterized by manic episodes, during which the patient sleeps very little, sometimes staying up for days. Manic phases are frequently marked by grandiose behavior or thoughts. It is common for a patient in a manic phase to start large projects, which he is subsequently unable to finish. The manic phase is followed by a depression, which can be lengthy and severe. For example, in Mr. Abboud's case, one of his depressive periods lasted for approximately 1-½ years. During that entire time he rarely got out of bed, slept excessively and only ate because family members brought food to him.

Dr. Koricke has explained that Mr. Abboud's Bipolar Disorder caused him to experience markedly diminished auditory attention capacity. This symptom caused Mr. Abboud very significant distractibility. His Bipolar Disorder has also caused him to have a long-term problem with an abnormal sleep cycle, causing him to either sleep for very extended periods of time, often in excess of 24 hours at a time, or to not sleep for up to

several days at a time. His symptoms include grandiosity, evidenced by taking on more work or projects that he could reasonably handle in an organized, detail-oriented fashion. While he felt he could handle these massive responsibilities, he could not in fact accomplish such tasks in the manner required. His attention to detail was poor, as evidenced by the state of his financial records and data.

Mr. Abboud has had many manic episodes in his life. He frequently starts major projects, which he cannot finish. He also attempts to do far too much and as a result makes serious judgment errors.

Mr. Abboud's diminished mental capacity, namely his bipolar disease, contributed to the commission of his offense conduct. At the time of the offense conduct, Mr. Abboud was engaged in running the family business, which involved several different stores. He was also heavily involved in politics, in particular, with the National Arab-American Business Association. Because Mr. Abboud suffered from bipolar disorder, he tended to be grandiose, believed he could manage everything, did not consider the consequences of his actions.

His involvement in the offense conduct should be judged in light of the fact that that he suffers from bipolar disorder, which impaired his judgment.  Mr. Abboud both did not understand the wrongfulness of his behavior compromising his offenses nor was he able to exercise appropriate powers of reason.

The fact that Mr. Abboud was able to run his business and be involved in politics does not mean that he did not suffer from diminished mental capacity. Many defendants who suffer from mental disorders are nonetheless high functioning individuals. *E.g.,*

*United States v. McBroom*, 124 F.3d 533, 539-40 (3d Cir. 1997) (attorney); *see also United States v. Checoura*, 176 F. Supp. 2d 310 (D.N.J.2001) (departure for compulsive gambling disorder in extensive embezzlement case); *United States v. Riedl*, 164 F. Supp. 2d 1196, 1201 (D. Haw. 2001) (property owner and manager); *United States v. Shore*, 143 F. Supp. 2d 74 (D. Mass. 2001) (businesswoman suffering from depression). The fact that a defendant is able to function in a professional or business capacity does not mean that the defendant does not suffer from diminished mental capacity and does not preclude a departure. *United States v. Cockett*, 330 F.3d 706, 714-15 (6th Cir. 2004)(tax preparer's impairment in reasoning supported departure); *McBroom*, 124 F.3d at 539-40 (downward departure for practicing attorney suffered from mood disorder and disorders of impulse control); *United States v. Ribot*, 97 F. Supp. 2d 74, 75-76 (D. Mass. 1999) (downward departure for diminished capacity resulting from longstanding depression in embezzlement and income tax evasion case; depression was in turn rooted in defendant's childhood).

Similarly, the fact that Mr. Abboud may have understood that what he was doing was wrong does not disentitle him from a departure. *See United States v. Cockett*, 330 F.3d at 713, 715-16 (6th Cir. 2004)(impairment in reasoning does not require a showing that the defendant lacked all reason, upholding departure for defendant whose mental impairments resulted in her rationalization of the offense conduct); *see also United States v. Sadolsky*, 234 F.3d 938, 942-944 (6th Cir. 2000) (upholding downward departure for compulsive gambling disorder which contributed to the commission of fraud offense). The question is whether the defendant suffered from a cognizable disorder, which

significantly reduced his mental capacity and contributed to his commission of the offense.

Mr. Abboud suffered from Bipolar Disorder. Dr. Koricke has opined that he has suffered from this disease for many years, long before the offense conduct in this case. While Mr. Abboud did not experience psychosis from the Bipolar Disorder, his mental capacity was nonetheless impaired. Respectfully, this Honorable Court should depart downward from the advisory guidelines, or in the alternative, impose a reduced, non-guideline sentence.

### 3. A Just Sentence is warranted.

Defendant respectfully requests this court to impose a reduced sentence below the advisory guideline range, either through a downward departure and/or a variance. As previously discussed, Mr. Abboud qualifies for a downward departure, because his conduct fell outside the heartland of the money laundering guidelines. Furthermore, the loss calculated under the fraud guidelines overstates the seriousness of his conduct. Additionally, this court should consider the fact that he has paid full restitution. *Kim*, 364 F.3d at 1240-43. Defendant's acceptance of responsibility supports the two-level downward adjustment, an equivalent downward departure, or a non-guideline sentence under 18 U.S.C. § 3553.

18 U.S.C. § 3553(a)(1) also supports imposition of a sentence below the advisory guidelines. Mr. Abboud's life has not been a criminal one. Rather, he has supported his family, engaged in gainful and lawful employment, and generally made numerous

positive contributions to his family, his community and to society. See Exhibit 5, letter from State representative James Trakas, Exhibit 6, Ruth Abboud, along with other letters, which have been given to the Court by Attorney James R. Willis.

Mr. Abboud He is a devoted husband, brother and parent who has made positive contributions to his community. He has absolutely no criminal history. Furthermore, the nature and circumstances of the offense are unusual. Mr. Abboud committed the offense conduct while juggling numerous financial responsibilities and while he was mentally impaired. While this is not an excuse, he did not use the money for extravagant expenditures or to fund a criminal enterprise. Thus, Mr. Abboud's history and character and the nature and circumstances of the offense support a reduced sentence. He is genuinely contrite and sorry for all that has happened. See Exhibit 7, letter /statement from Defendant Elie F. Abboud.

This Court also must consider the four factors set forth in section 3553(a)(2) in imposing sentence. Consideration of these four factors supports imposition of a reduced non-guideline sentence. The first factor to be considered under § 3553(a) is just punishment. In imposing a "just punishment," this Court may consider that Mr. Abboud already has made paid full restitution and corrected the wrong he committed. This Court also should consider that Mr. Abboud committed the offense conduct while suffering from Bipolar Disorder, which disorder he likely has had for most of his adult life. Finally, this Court may consider Mr. Abboud's painful life history.

Second, deterrence would be adequately served by the proposed sentence. Mr. Abboud has been completely deterred from further criminal conduct. Indeed, the very

banks that are the victims of this offense continue to do business with him. Moreover, it is questionable whether a prison sentence in the advisory guideline range, approximately eight years, will deter other offenders from similar misconduct. This is not a highly publicized case.

Third, a significantly reduced sentence is adequate to protect the public, particularly since Mr. Abboud does not pose a danger to the community. Mr. Abboud remained on bond for over four years, pending sentencing and appeal in this case. He fully complied with all conditions of release. Again, he fully repaid the banks involved in this case, almost two and one half years before he was indicted.

In conclusion, defendant respectfully requests this court impose a significantly reduced sentence of imprisonment. This suggestion is based on the fact that the money laundering guidelines overstate the seriousness of the offense. Furthermore, because Mr. Abboud accepted responsibility for his conduct and fully repaid the banks prior to the charges being filed in this case, either a downward adjustment or an equivalent downward departure is appropriate.

Respectfully, and moreover, even the offense level for fraud overstates the seriousness of the offense, supporting a downward adjustment.

Finally, Mr. Abboud suffers from diminished mental capacity stemming from Bipolar Disorder. His diminished capacity contributed to the offense and merits a reduction of two to four levels.

Considering all the factors present in this case, a sentence significantly below 97 months of imprisonment is "minimally sufficient" to achieve the purposes of sentencing.

## <u>OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT</u>

Now comes Defendant, Elie Abboud, by and through undersigned counsel, William L. Summers and Edwin Vargas, and hereby states the following Objections to the Presentence Investigation Report (Herein referred to as PSI) prepared by his Supervising Probation Officer, John Keith Schutter.

The defendant objections to the following:

1.    The Defendant enters a technical objection in Paragraph 11 as the PSI writer failed to verify the naturalization of his citizenship.

2.    The Defendant enters a technical objection in Paragraph 92, 93 and 94, as being unwarranted commentary as the PSI writer was told that the Defendant had hired new and professional CPA's and contemporaneously with this presentation, is filing his 2004 and 2005 Federal Income Tax returns, See Exhibits 1, 2 and 3, including correspondence from Blake and Wachs CPA.

3.    The Defendant objects to Paragraphs 2, 17, 18, 20, and 26 in that the amount of loss is incorrectly calculated.  Please note the PSI writer does go through a series of calculations to arrive at his attributed amount of loss as $1,129,179.10.  However, the correct figures are located in PSI Exhibit 2 in which Park View clearly states that $840,475.02 was paid out of the defendant's cash accounts toward any deficit and then another $1,239,970.45. This left a balance of $634,559.60.

However this amount did not go unpaid. In November of 1999, the same month that defendant is given credit for reducing loss to NCB, Park View for

this the defendant, arraigned for a loan from Great Lakes Bank and as collateral for that loan the defendant pledged his family's large block of Park View stock.  Park View then bought that loan from Great Lakes Bank and the defendant paid the remaining balance off by depositing money with Park View. Thus at the time of discovery there were other assets pledged as collateral for the overdraft.

The sale of the Park View stock in 2002 by Park View was unrelated to any debt that the defendant owed Park View in relation to this case. See Exhibit 8, Park View Federal Letter of May 28, 2004.

4. The Defendant respectfully objects to paragraphs 40 thru 41 of the updated PSI report based on the banks findings as stated in paragraph two (2) of these objections.  The loss to Park View therefore can be realistically only zero (0).

5. The Defendant objects to paragraph 29 of the updated PSI in that respectfully, it is inappropriate to use as evidence of loss, amounts contained in the indictments to set the amount in the convicted charge of Conspiracy to Commit Money Laundering for Court 73.  The trial judge specifically indicated for the jury that they were not to determine amounts of money or loss in their deliberations.  Therefore, proper evidence should be produced to prove this amount. (TR PG. 1079)

6. The Defendant respectfully objects to paragraph 34 of the updated PSI and will provide a statement to substantiate his acceptance. (Defendant's objections & PSI Exhibit A)

7.      Respectfully, the Defendant objects to paragraph 47 and 48 of the updated PSI in that proper tax returns were submitted for the years 1999 and 2000, with a considerably lower tax amount owed than is opined by the PSI writer.

8.      The Defendant respectfully objects to paragraph 66 of the updated PSI in that the report states that the defendant did not submit additional updates when in fact he did which is indicated in the lengthy financial disclosure section. And assured by undersigned counsel as an officer of this Court.

9.      The Defendant respectfully objects to paragraph 67 of the updated PSI and for his supplemental statement regarding personal and family data please see the defendants sentencing memorandum included above and the provided Psychological report that the defendant has filed under seal. (Defendant has filed the report of Dr. Deborah Koricke with the court and moved that this honorable court keep this information sealed). Furthermore, it is respectfully suggested that the defendant's citizenship, as naturalized United States Citizen, is verifiable. The probation department should be directed to make this important adjustment and suggestion of verification in its final report to the Court, see objection number 1.

10.     The Defendant respectfully objects to paragraph 70 of the updated PSI in that the family information is incorrect please see defendant's sentencing memorandum.

11.     The Defendant respectfully objects to paragraph 73 of the updated PSI as a lengthy report was submitted to the Probation department, which indicates that

the defendant suffers from a bi-polar disorder and Post Traumatic Stress Disorder. (Please see the aforementioned attached report of Dr. Deborah Koricke)

12. The Defendant respectfully objects to paragraph 79 of the updated PSI in that AEMM Properties was exclusively in the business of buying, selling, managing and holding real estate.

13. The Defendant respectfully objects to paragraph 82 of the updated PSI in that AEMM Properties did not operates store but was only in the business of buying, selling, managing and holding real estate. Furthermore, paragraph 82 of the PSI incorrectly states that ENEA sold a store. ENEA only sold real estate and further that that proceeds from the sale of that real estate was approximately 1.1 million dollars of which approximately $429,389.19 was cleared after costs and expenses.

14. The Defendant respectfully objects to paragraph 83 of the updated PSI the correct address of the property is 26159 thru 26175 Euclid Avenue, Euclid, Ohio. Furthermore, the property was not repurchased but sold out of the bankrupt company. Further, WAFP Inc. owns the convenient store located at this address. Finally it must be noted that Worldwide Money Orders Company was created by the Defendants to get a license to do business in money orders. However no license was ever obtained and the company conducted no business.

15.    The Defendant respectfully objects to paragraph 84 of the updated PSI in that Malek Abboud, Elie's brother, derived his income from this store. Defendant Elie Abboud's son was and is a full time Law Student at The Ohio State University College of Law.

16.    The Defendant respectfully objects to paragraph 85 of the updated PSI because the defendant on this business provided the probation officer considerable information.

17.    The Defendant respectfully objects to paragraph 87 of the updated PSI in that the balance of the money owed for the inventory has not been paid and corresponds to paragraph 90 of the PSI which shows the loan obligations and debt incurred to open this store.

18.    The Defendant respectfully objects to paragraph 88 of the PSI as it inaccurately states the facts of this transaction.  In November of 2004 the defendant was in default of the mortgage on the property located in the District of Columbia. The defendant was attempting to sell the property in an arms length transaction hoping to generate more money.  However, the bank that had the mortgage on the property sold the property in foreclosure.  The sale of the District of Columbia property was not related to the AEMM bankruptcy.  In March of 2006 the defendant received a residual check for $16,000.00 from the proceeds left over from that foreclosure sale.

19.  The Defendant respectfully objects to paragraph 94 of the updated PSI in that the Malek referred to is not the son of the defendant but the defendant's brother.

20.  The Defendant respectfully adopts and reincorporates where relevant the objections lodged both previously and concurrently by his brother & Co-Defendant defendant and his prior counsel as if fully rewritten herein. Please see Docket numbers, 231-01, 235-01, 238-01, and 241-01.

Respectfully submitted,

*SUMMERS & VARGAS Co. L.P.A.*

  /s/ WILLIAM L. SUMMERS
*WILLIAM L. SUMMERS* (#0013007)
**EDWIN J. VARGAS** (0062913)
2000 Illuminating Building
55 Public Square
Cleveland, Ohio 44113
(216) 591-0727

 /s/ EDWIN J. VARGAS_____
**WILLIAM L. SUMMERS** (#0013007)
*EDWIN J. VARGAS* (0062913)


*Attorneys for Defendant Elie Abboud*

### <u>*CERTIFICATE OF SERVICE*</u>

The undersigned does hereby certify that the foregoing **DEFENDANT'S SENTENCING MEMORANDUM** was electronically filed on the 31st day of July 2006:

**ANN C. ROWLAND, A.U.S.A**.
Office of the U.S. Attorney
Northern District of Ohio
801 Superior Avenue, W
Cleveland, Ohio 44113

**MATTHEW B. KALL, A.U.S.A.**
Office of the U.S. Attorney
Northern District of Ohio
801 Superior Avenue, W
Cleveland, Ohio 44113

 /s/ William L. Summers
**WILLIAM L. SUMMERS**

*Attorneys for Defendant Elie Abboud*